**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERTA STEELE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-5334 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| FOX VALLEY PARK DISTRICT, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**<u>ORDER</u>**

For nearly two decades, Plaintiff Roberta Steele worked for the Fox Valley Park District in the Dance Program at a community center. But in her last five years, Steele's supervisors disciplined her several times and placed her on a Performance Improvement Plan because of untimely work and a lack of attention to detail. Then, in 2017, Steele failed to timely respond to an assignment. The Park District met with Steele and informed her of her termination. Instead, she resigned.

Steele later filed suit, claiming age discrimination. She alleges that new management took over the community center and made disparaging age-based comments to older employees. She believes that her forced resignation was simply a way to usher older employees out the door, and replace them with fresh faces.

Discovery followed, and the Fox Valley Park District later moved for summary judgment. For the following reasons, the Court grants its motion.

## Background

### I.    Steele's Positions

In August 1998, the Fox Valley Park District hired Roberta Steele as a part-time Dance Assistant for the Dance Program at the Park District's Prisco Community Center.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 9 (Dckt. No. 68).[1]  She was 42 years old.  *Id.*

She received two promotions.  In 2004 or 2005, the Park District promoted Steele to Dance Coordinator.  *Id.* at ¶ 10.  Then, in 2010, the Park District promoted her again to the full-time position of Recreation Supervisor for the Dance Program.  *Id.*

As Recreation Supervisor, Steele oversaw the entire dance program.  *Id.* at ¶ 12.  She supervised employees and oversaw payroll, budgeting, and dance registration.  And importantly, Steele had the responsibility of inputting class descriptions on the Park District's software, so that the public could see the class offerings.  *Id.*

When she became the Recreation Supervisor, Steele's direct supervisor was Jaime Ijams. *Id.* at ¶ 11.  Ijams worked as the Facility Manager for Prisco.  *Id.*

### II.    Disciplinary Action in 2012

Steele received her first disciplinary action in 2012, two years after she became the Recreation Supervisor.  In July 2012, the Park District issued her a Corrective Interview Form for a "Procedure Violation."  *Id.* at ¶ 32; Corrective Interview Form (Dckt. No. 66-12, at 32–33 of 116).  The form stated that Steele had failed to accurately pay two members of her staff during a recent pay period.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 32 (Dckt. No. 68).

---

[1]  Steele filed a statement of additional facts, and a response to Defendant's facts, in a single document. *See* Pl.'s Statement of Additional Facts that Require the Denial of Summ. J. and Resp. to Def.'s Statement of Facts (Dckt. No. 68).  The statement of additional facts (40 paragraphs) comes first, and the response to Defendant's facts (80 paragraphs) comes second.

The form included a paragraph that covered the necessary "Corrective Action." *Id.* at ¶ 32; Corrective Interview Form (Dckt. No. 66-12, at 32 of 116). The form explained that Steele needed to improve communications with her staff about their schedules. She also needed to get better at keeping a file of their schedules, hours, and shifts to accurately complete payroll every two weeks, among other actions. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 33 (Dckt. No. 68); *see also* Corrective Interview Form.

One month later, in August 2012, Ijams placed Steele on a Performance Improvement Plan. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 34 (Dckt. No. 68); Performance Improvement Plan (Dckt. No. 66-12, at 34 of 116). The plan spanned nine pages, covering Steele's "Management and Leadership Skills," "Self Management Skills," and "Programming." *See* Performance Improvement Plan, at 1, 5, 8. The form listed areas where Steele needed to improve. Specifically, she needed to work on:

> giving instructors feedback throughout the year; being honest in the workplace after Ijams discovered Steele had been dishonest about a staff member's evaluation and speaking with another staff member regarding her job description; training staff and having follow-through; working on self-management skills, including improvement on meeting deadlines, staying organized, and attention to detail; improvement of her communication skills; attention to detail for the activity guide and deadlines set by Marketing; and expanding programming for Dance across the Park District's three facilities, among other areas of concern.

*See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 34; *see also* Performance Improvement Plan.

The plan also noted that "Steele admitted the Performance Improvement Plan was factually accurate, but felt the part regarding following through with supplies needed by instructors was misconstrued because she felt that was an issue with lack of availability and budgeting." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 34 (Dckt. No. 68). She reviewed,

signed, and returned the plan paperwork. *Id.*; Performance Improvement Plan, at 9 (Dckt. No. 66-12, at 42 of 116).

The plan noted that Steele's "continued employment with the district [wa]s in jeopardy." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 35 (Dckt. No. 68); *see also* Performance Improvement Plan (Dckt. No. 66-12, at 34 of 116). The Park District let her know that it needed to see significant improvement for Steele to keep her job. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 35; *see also* Performance Improvement Plan ("Significant improvement in performance will need to be observed and realized for continued employment.").

At that point in the story, the parties leave the reader hanging. The parties do not reveal whether Steele satisfactorily completed the Performance Improvement Plan. Ijams did testify that Steele righted the ship and completed the Performance Improvement Plan. *See* Ijams Dep., at 268:3-11 (Dckt. No. 68-9). But that fact is not in the Rule 56.1 statements.

The record does not include any evidence of any additional problems in the next few years. The key takeaway, it seems, is that Steele kept her job, and that there were no significant disciplinary actions (for the time being, anyway).

## III.    Steele's New Manager

In November 2012, Steele began reporting to the Performing Arts Manager at the Prisco facility. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 13 (Dckt. No. 68). At that time, the Performing Arts Manager was Kyle Donahue. *Id.* at ¶ 14.

The parties disagree about whether Steele reported to anyone else. The Park District argues that she began reporting to the Performing Arts Manager "*instead of* the Facility Manager," meaning Ijams. *See* Def.'s Statement of Facts, at ¶ 13 (Dckt. No. 66) (emphasis

4

added).  But Steele says that she reported to the Performing Arts Manager *as well as* the Facility

Managers, including Ijams.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 13 (Dckt. No. 68).

Either way, both parties agree that Steele began reporting to the Performing Arts

Manager to some extent.  So, Steele reported to Donahue, and maybe others.  Steele is the

non-movant, and she presented evidence on this point, so the Court assumes that her version is

true for purposes of this motion.

## IV.    Disciplinary Action in 2015

The parties then skip ahead to 2015, so the Court will follow suit.

In September 2015, Steele received her second Corrective Discipline Form.  *Id.* at ¶ 36;

*see also* Corrective Discipline Form (Dckt. No. 66-12, at 52 of 116).  This time, the notice came

from Donahue (again, the Performing Arts Manager).  *See* Pl.'s Resp. to Def.'s Statement of

Facts, at ¶ 36 (Dckt. No. 68).  The write-up stated that Steele had submitted paperwork for staff

evaluations and pay raises four months late.  *Id.*; *see also* Corrective Discipline Form.  The

write-up described the "Corrective Action" that Steele needed to take.  *See* Corrective Discipline

Form.  She needed to "adhere to timelines in place for staff evaluations and raises."  *Id.*

Steele does not dispute that she received this second Corrective Discipline Form.  But she

disputes the accuracy of the discipline's information.  *See* Pl.'s Resp. to Def.'s Statement of

Facts, at ¶ 36 (Dckt. No. 68).

At deposition, Steele testified that she disagreed with the discipline.  In her view, she

turned in the staff paperwork on time because her instructors "were paid and received their raises

differently than other employees of the Park District."  *See* Steele Dep., at 144:20-22 (Dckt.

No. 66-8).  As a result, her employees' paperwork was not "due at the same time because [the

employees] had not finished out the calendar year for the dance session."  *Id.* at 144:22-24.

According to Steele, the paperwork "went in later than everybody else's, and that was acceptable every year except this one." *Id.* at 144:25 – 145:3.

Steele acknowledged at deposition that she did not explain her position in the Corrective Discipline Form itself. *Id.* at 147:20 – 148:2. That is, the form included a section that allowed the employee to respond. It read: "Employee Response: Do you agree with the description and the action? If not, please explain." *Id.* at 147:20 – 148:2. Steele left it blank. *See* Corrective Discipline Form (Dckt. No. 66-12, at 52 of 116). But Steele testified that she did verbally object to Donahue before signing and dating the form. *See* Steele Dep., at 146:11-20 (Dckt. No. 66-8).

She does not dispute that the Park District disciplined her for a second time. So, by 2015, the Park District had disciplined her twice (once in 2012, and again in 2015), and had placed her on a Performance Improvement Plan.

## V.      Changes to the Programming Software

Around the time of Steele's formal discipline in 2015, the Park District made some changes to its programming software. The Park District replaced its expiring programming software, named CLASS, with a new software, named RecTrac. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 16 (Dckt. No. 68).

The parties don't put much in the record about what, exactly, RecTrac is. But the Court understands it to be a software platform that allows members of the public to see offerings from the Park District and register online. According to its website, RecTrac "offers fully integrated parks and recreation management software to increase your efficiency and productivity while providing extensive reporting and statistical data." *See* RecTrac, Vermont Systems, https://www.vermontsystems.com/products/rectrac/ (last visited on Feb. 22, 2022). Some of its

features include tracking class registration, managing ticketing, scheduling leagues and events, and handling equipment rentals. *Id.*

Ijams (again, the Facility Manager) managed the transition to RecTrac and assembled a committee to help with the implementation. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 16 (Dckt. No. 68). The committee members included "the go-to people for CLASS at their locations." *Id.* The Park District asserts that the members were primarily upper management, but Steele argues that only three of eight members were upper management. *Id.* But both parties agree that Donahue served on the RecTrac committee from the Prisco facility. *Id.* at ¶ 17.

In May 2016, RecTrac went live. *Id.* at ¶ 20. For the first season, Recreation Supervisors (like Steele) had to submit their programming information to the RecTrac committee. The committee members would then manually enter the information for each program for summer registration while the staff (including Steele) learned the system. *Id.*

The technology was new, but the jobs stayed the same. The parties agree that Steele's job responsibilities did not change when RecTrac went live. *Id.* at ¶ 21; *see also id.* at ¶ 29 ("The responsibilities or functions of the Recreation Supervisors did not change when the Park District switched from CLASS to RecTrac.").

And the parties agree that the deadlines for certain duties did not change, either. For example, the Marketing Department set deadlines for departments to submit their schedules. Those schedules then went into an Activity Guide, which the recreation programming issued for the public to use each season when registering for programs. *Id.* at ¶ 28. For these deadlines, the Marketing Department used a timeline, which the full-time staff with recreation programming responsibilities (like Steele) had to meet. *Id.* The Marketing Department scheduled the

deadlines months in advance, and when the Park District switched from CLASS to RecTrac, that process did not change. *Id.* at ¶ 29.

The parties also agree that the inputs required by the new software did not change. Instead, the program continued to require inputs for class descriptions, fees, room reservations, dates, minimum participation, and ages. *Id.*

So, all things considered, the parties agree that not much changed, except the technology. Steele had some new technology to deal with, but her job was no different than before. The more things changed (like the technology), the more things stayed the same.

## VI.    New Management

In September 2016, leadership changed. Donahue voluntarily left his positions as the Performing Arts Manager and as a RecTrac committee member. *Id.* at ¶ 15. Two people filled his shoes.

Superintendent of Recreation Michael Hays joined the RecTrac committee, because of his experience with the software at a different park district. *Id.* at ¶ 18. Two months later, Lauren Jansen replaced Donahue as Performing Arts Manager. *See* Def.'s Statement of Facts, at ¶ 15 (Dckt. No. 66). As Performing Arts Manager, Jansen became Steele's supervisor.[2] *Id.*

## VII.   Additional Programming Responsibilities

The next year, the Recreation Supervisors – including Steele and Jansen – gained additional programming responsibilities. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 22 (Dckt. No. 68). The Park District received a state grant for an expansion project for the Prisco

---

[2] Mirroring the previous disagreement about Donahue, Steele disputes that Jansen was her *only* supervisor but admits that she was *one of* her supervisors. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 15 (Dckt. No. 68).

Community Center facility, beginning in November 2017. *Id.* To prepare for the expansion, the Park District expected the Recreation Supervisors to focus on program growth. *Id.*

Recreation Supervisors' responsibilities changed and grew, but their deadlines to input class information for the Activity Guides remained the same. *Id.* at ¶ 37. In 2017, the Marketing Department's timelines for Activity Guides required Recreation Supervisors to enter all programs into RecTrac by February 9, 2017. *Id.* This deadline applied to all Recreation Supervisors with programming responsibility, including Steele. *Id.*

Steele, however, did not enter the room reservation information for the Dance Programs by the deadline. *Id.* at ¶ 38.

In her brief, Steele does not dispute that she did not submit the room reservation information by that deadline. Instead, she argues that there was no deadline for the dance room reservations. *Id.* at ¶¶ 38–39. Steele testified that she had a longstanding practice of waiting until later in the season to reserve dance rooms. *Id.*

After she missed the deadline, Jansen and Hays told Steele that they wanted it done differently (that is, by the deadline). *Id.* at ¶ 40. So, she agreed to begin following the Marketing Department's deadlines in the future. *Id.*

Then, Summer Registration Day for the park activities arrived – and trouble soon followed. Most parents registered for classes online. *Id.* at ¶ 41. Yet at least two parents had issues registering for dance classes online. *Id.* at ¶ 42. Dave Huber, one of Steele's coworkers, contacted Steele about a customer who was having a problem registering. *Id.* Steele did not relay those concerns to Jansen, her supervisor. *Id.*

The issue was simple. Some of the information for the dance programs was incorrect on RecTrac, including the ages for two dance classes. *Id.* at ¶ 43. An incorrect age range interfered

with the ability of some young aspiring dancers to register. *Id.* ("If the ages are incorrect in RecTrac, customers who have children outside of the stated age range cannot register for the class.").

## VIII. Disciplinary Action in 2017

As a result of these problems, Jansen issued Steele her third Corrective Discipline Form on May 15, 2017. *Id.* at ¶ 46; Corrective Discipline Form (Dckt. No. 66-12, at 53–54 of 116).

The write-up stated that residents had difficulty registering for dance classes due to an inaccurate program entry in RecTrac, including incorrect age levels, inactive classes, and fees which were different from the printed activity guide. The form requested that Steele correct the fees and age levels. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 46 (Dckt. No. 68).

The form also noted that Steele needed to have greater attention to detail during program entry, and that she needed to enter all information in RecTrac by seasonal deadlines and keep it updated before registration. *Id.* The form also reminded her that these mistakes impact other staff and operations and hurt the Park District's reputation. *Id.* at ¶ 47.

Finally, the Corrective Discipline Form stated that if Steele needed assistance, clarification, or additional training to help her succeed, she should reach out to her manager directly and do so before the deadline. *Id.* at ¶ 48. Steele's supervisors reminded her that meeting deadlines was an ongoing concern, and that she needed to address that concern through greater effort and better communication. *Id.* The form concluded by noting that Steele could face further disciplinary action up to and including termination if she took no corrective action. *Id.*

Steele admits that the third Corrective Discipline Form put her on notice of the Park District's performance concerns. *Id.* at ¶ 50. She understood what her employer expected of her

going forward, and she knew that she could be terminated if her performance did not improve.
*Id.* Steele testified that she requested additional training from management, but she never
received any help. *See* Steele Dep., at 86:3 – 91:6 (Dckt. No. 66-8).

## IX. More Management Changes

Meanwhile, the Park District experienced more management changes. The Park District
promoted Ijams (the Facility Manager) to Director of Recreation. *See* Def.'s Resp. to Pl.'s
Statement of Additional Facts, at ¶ 4 (Dckt. No. 73).

In April 2017, Krista Mulready became the new Facility Manager at Prisco. *See* Pl.'s
Resp. to Def.'s Statement of Facts, at ¶ 23 (Dckt. No. 68). As Facility Manager, Mulready
supervised Prisco's full-time staff, managed the budget, and oversaw the ongoing expansion and
renovation project. *Id.* Mulready was 37 years old. *See* Def.'s Resp. to Pl.'s Statement of
Additional Facts, at ¶ 4 (Dckt. No. 73).

According to Steele, Mulready discriminated against older employees. Steele presented
evidence that Mulready used words and phrases like "stale," "stagnant," "not up to the task," or
"not able to handle" when referring to older employees. *See* Pl.'s Statement of Additional Facts,
at ¶ 33 (Dckt. No. 68). Mulready also used phrases like "keep everything fresh," "we need new," 
and "push for innovation." *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 5 (Dckt.
No. 73). Specifically, Steele presented evidence that "Mulready used words like this at a staff
meeting, she directed it towards older employees and humiliated them." *See* Pl.'s Resp. to Def.'s
Statement of Facts, at ¶ 24 (Dckt. No. 68); *see also* Pl.'s Statement of Additional Facts, at ¶ 33.

Mulready admits that she used these phrases and similar language. But she argues that
the purpose was not age discrimination. Instead, Mulready says that she used phrases like "keep
things fresh" to refer to innovation and staff creativity, and used words like "stagnant" to refer to

11

the current programming. *See* Def.'s Statement of Facts, at ¶ 24 (Dckt. No. 66). That is, she would use this language to ask "[w]hat more can we do to create revenue, [and] increase participation." *See* Mulready Dep., at 178:7-8 (Dckt. No. 66-14).

But Steele interpreted Mulready's language differently. Specifically, she thought that her language was ageist. She cites her deposition, along with the declarations of other employees, to support her interpretation of what Mulready meant when she used terms like "stale" and "stagnant."

Steele testified that she interpreted this language as an attempt to humiliate older employees. *See* Steele Dep., at 119:4-11 (Dckt. No. 66-8). Steele testified that she felt that such language was "directed toward employees," not the environment as a whole. *Id.* at 120:7-8. Likewise, her declaration says that "[i]t [was her] understanding that Ms. Mulready use [*sic*] words and phrases like 'stale,' 'stagnant,' 'not up to the task,' 'not able to handle,' when referring to or speaking about older employees. [B]y contrast, Ms. Mulready referred to younger employees as 'new blood.'" *See* Steele Dec., at ¶ 13 (Dckt. No. 68-24, at 3 of 12).

Two other employees heard Mulready use similar language to older employees. Jennifer Huber and Barbara Daniels both offered declarations stating that they "observed Ms. Mulready use words and phrases like 'stale,' 'stagnant,' 'not up to the task,' 'not able to handle,' when referring to or speaking about older employees. [B]y contrast, Ms. Mulready referred to younger employees as 'new blood.'" *See* Huber Dec., at ¶ 10 (Dckt. No. 68-24, at 6 of 12); Daniels Dec., at ¶ 10 (Dckt. No. 68-24, at 11 of 12).

And more generally, Steele believes that the culture changed for the worse when Jansen (the new Performing Arts Manager) and Mulready (the new Facility Manager) arrived. She testified: "I had been an employee for 20 years, almost 20 years, and been promoted several

12

times. But when Laura [Jansen] and Krista [Mulready] who were both younger than [her], were hired, the culture changed dramatically, and [she] wasn't good enough." *See* Steele Dep., at 68:4-6 (Dckt. No. 66-8).

Steele testified that new management treated younger employees better than older employees. But the testimony was at a high level of generality. When asked how Mulready treated younger employees, Steele responded that Mulready "just did different things with them, different conversations and including them. She would greet them differently than she did those of us who were older." *Id.* at 70:5-8.

But Steele didn't testify about *how* Mulready treated younger employees differently or *what* Mulready excluded her from. And when asked if she requested to be included in anything, Steele said that she could not "remember anything." *Id.* at 70:15-17. She provided no other evidence about how Mulready treated younger employers, either.

At deposition, Steele offered an example that she viewed as disparate treatment. She testified that "[w]hen [Mulready] would be out, it was always someone younger that would be acting facility manager, not the older employees." *Id.* at 70:3-5. But Steele does not dispute the Park District's evidence that the Performing Arts Manager (that is, Jansen) always acted as Facility Manager when Mulready was out. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 76 (Dckt. No. 68).

Steele also testified about another employee who received a write-up. She alleged that when a Recreation Supervisor Rafa Martinez allegedly received write-ups for failing to pay contractors correctly, the Park District did not fire him. *See* Steele Dep., at 68:14-24 (Dckt. No. 66-8). But Steele offered no specifics about the underlying circumstances. For example, there is

nothing in the record about what Martinez received a write-up for, or whether he had a disciplinary history.

## X.       Proofing the Program Information for the Fall of 2017

In 2017, the Park District's Marketing Department set a deadline for Recreation Supervisors to submit a Word Proof of their program information for the Fall 2017 season. Everyone needed to submit their material to Mulready by June 7 at 5:00 p.m. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 53 (Dckt. No. 68).

Management put an early deadline on Steele, too. The Park District told Steele to submit the Word Proof to Jansen beforehand, so that Jansen could proofread it and discuss any questions that she might have. *See* Def.'s Statement of Facts, at ¶ 54 (Dckt. No. 66).

Steele knew about the need to submit an early draft to Jansen. She admitted at deposition that she needed to send it to Jansen first:

> Q:     Did you understand that it was a requirement to provide the proofs
> to Ms. Jansen prior to letting Ms. Jansen and Ms. Mulready know
> that the proof was on the common drive?
>
> A:  Yes.

*See* Steele Dep., at 188:24 – 189:4 (Dckt. No. 66-8).

But Steele did not provide a proof to Jansen beforehand. *See* Pl.'s Resp. to Def.'s Statement of Facts at ¶ 55 (Dckt. No. 68).

In response to the Park District's Rule 56.1 statement of facts, Steele disputes the notion that the Park District required her to give the proof to Jansen beforehand. *Id.* That blanket denial is inconsistent with her deposition testimony (above).

Steele attempted to support her denial by offering testimony about a different point. She testified that she asked for Jansen's approval to finish the project "a little later," and Jansen said

14

that was fine. *Id.*; *see also* Steele Dep., at 188:13-21 (Dckt. No. 66-8). That's not exactly on point. The issue is whether Steele needed to give a preview version to Jansen, before putting it on the common drive for Mulready to see. That's different than whether Jansen gave her more time to do so.

In any event, Steele did submit the Word proof. But she didn't give Jansen a sneak-peek version for her to review. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 55 (Dckt. No. 68). Instead, at 6:13 p.m. on June 7 (so, about an hour after the deadline for everyone), Steele emailed Mulready and Jansen and let them know that she had finished her Word proof. *Id.* at ¶ 56; *see also* 6/7/2017 Email (Dckt. No. 66-24, at 13 of 21).

Two days later, Mulready emailed Steele and the other Recreation Supervisors saying that she had reviewed their Word Proofs. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 58 (Dckt. No. 68). She made modifications and asked them to "[p]lease take the red highlighted areas and make appropriate changes in RecTrac." *Id.* (quoting 6/9/2017 Email (Dckt. No. 66-24, at 17 of 21)).

Despite the new assignment, Steele did nothing. She argues that she did not understand there to be a new assignment. *Id.* at ¶ 59 ("It was unclear to Ms. Steele that there was a new specific assignment to complete because Ms. Jansen previously advised Ms. Steele that the work on the document referenced in the email from Ms. Mulready was done.").

A few days later, on June 13, Jansen reached out to Steele. *Id.* She noted that Steele had "not begun any of the edits" and requested that she "[p]lease review and complete edits (in red and yellow highlight) in the word doc today as they are now passed due to marketing." *See* 6/13/2017 Emails (Dckt. No. 66-24, at 16 of 21).

Steele responded by email. She wrote: "When we spoke last week, you indicated that I had edited the correct file for Marketing. I was under the impression that these only needed to be updated to be viewed online." *See* 6/13/2017 Emails (Dckt. No. 66-24, at 15 of 21). But she promised to "update them tonight." *Id.*

Jansen responded by reiterating her request that Steele "[p]lease look through the edits [Mulready] provided, [and] update the word doc for our review." *Id.*

The next day, Steele reported that everything was done. She sent an email to Mulready saying that "[t]hese are all updated and the corrections entered into RecTrac." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 60 (Dckt. No. 68) (quoting 6/14/2017 Email (Dckt. No. 66-24, at 17 of 21)).

## XI. The Termination Meeting

That same day, the Park District held a meeting with Steele, Jansen, Mulready, and the Superintendent of Human Resources Lynn Wiltfong. *Id.* at ¶ 61. At the meeting, Mulready read a termination memorandum to Steele, which offered a number of reasons why the Park District was letting her go.

The memo spanned five paragraphs, and called attention to Steele's history of missing deadlines and her lack of attention to detail. It began:

> After careful consideration, the Fox Valley Park District has decided to terminate your employment effective today, June 14, 2017. As you know, you have been previously counseled and reprimanded regarding missing deadlines and your lack of follow through; most recently on May 10th. The process for making updates to the quarterly activity guide has been in place for years, and the deadlines imposed by marketing are in place for a reason. Your repeatedly missing the marketing deadline, lack of attention in the content and lack of follow-through when these issues are brought to your attention is unacceptable. After meeting with you and discussing the importance of this process, we had the same issues repeated this past week. There is a large burden that is placed on others when you are late

16

and the work is not accurate, which led to the result of performing much
of the work for you.

*See* Termination Memo (Dckt. No. 66-20, at 20–21 of 21).

The next paragraph described the District's inability to fix the problem and turn things

around. "The District has tried to work with you to overcome this and other shortfalls in your

performance, which has now overshadowed the good work that you do." *Id.* It continued:

"[Y]our lack of initiative and follow through on significant job functions can no longer be

tolerated. Your behavior detracts from an effective work environment and cooperation with

other departments and negatively impacts our ability to provide quality customer service." *Id.*

With that explanation, the Park District told her that it was time to part ways. "Your

conduct has eroded the necessary trust and confidence we must have in you. Accordingly, you

are being terminated from your employment, effective immediately." *Id.*[3]

The Park District provides evidence that Jansen, Mulready, Wiltfong, Hayes, and Ijams

took part in the decision to terminate Steele. *See* Def.'s Statement of Facts, at ¶ 64 (Dckt.

No. 66). Additionally, Director of Finance Diana Erickson and Executive Director Jim Pilmer

reviewed and approved the termination decision. *Id.*

Steele argues that it is unclear who actually decided to fire her. (As the Court will later

explain, this issue matters because Steele argues that the Park District lacked candor, which

suggests in her view that something fishy happened.) Specifically, Steele argues that the exact

role of Ijams, Wiltfong, Erickson, and Pilmer is disputed. *See* Pl.'s Resp. to Def.'s Statement of

Facts, at ¶ 64 (Dckt. No. 68).

---

[3] The Park District states that Wiltfong authored the memorandum, but Steele argues that the author may
have been Jansen. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 61 (Dckt. No. 68). While the author
of the termination memorandum is a genuine dispute, that dispute is not material for this case.

But in her response, Steele points to evidence about the role played by almost everyone. Specifically, Jansen, Mulready, and Hayes provided feedback that "drove the decision to terminate" her employment. *Id.* (quoting Def.'s Supp. Ans. to First Set of Interrog., at ¶ 8 (Dckt. No. 68-42)). Wiltfong "reviewed" and "approved" the termination memorandum from Mulready and Jansen. *Id.* (quoting Termination Memorandum (Dckt. No. 68-24)). The termination "was presented" to Erickson and "reviewed" with Pilmer. *Id.* (quoting Ijams Dep., at 139:15 – 140:6, 302:22 – 303:5, 303:22 – 305:1 (Dckt. No. 68-9)).

Apparently, Steele can account for everyone's role, except Ijams. But Ijams testified that she took part in the decisionmaking, and Steele offers no contrary evidence. *See* Ijams Dep., at 311:5-15 (Dckt. No. 66-2). As a result, Steele does not create a genuine dispute about who played what role in the decision to let her go.

Steele claims that, at the meeting, she requested another chance and additional RecTrac training, and asked to be placed on a Performance Improvement Plan. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 63 (Dckt. No. 68). But her citation is to her complaint, which is not evidence. So there is no evidence in the record that Steele requested another chance at her termination meeting.

During the meeting, Steele elected to resign in lieu of termination. *Id.* She provided the Park District with "a letter saying [she] was retiring" the next day, on June 15, 2017. *See* Steele Dep., at 200:7-11 (Dckt. No. 66-8); Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 63 (Dckt. No. 68).

At deposition, Ijams offered an explanation of why the Park District decided to let her go. Specifically:

> [Steele] was terminated due to ongoing performance concerns. Lack of
> follow-through with meeting deadlines. Repeating the similar – the exact
> same errors season after season. Actually back-to-back seasons. And you
> know, the errors that were making were . . . directly impacting our front
> line, meaning our customers, our staff that would need to jump in and help
> out. They were all having to compensate for errors that were being made
> [by Steele].

*See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 62 (Dckt. No. 68) (quoting Ijams Dep., at

260:13 – 261:1 (Dckt. No. 66-2)).

Steele believes that her termination had nothing to do with her performance. Instead, as

she sees it, the Park District let her go because of age discrimination. When she resigned, Steele

was 61 years old. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 8 (Dckt. No. 73).

## XII. The Lawsuit

Steele filed a Charge of Discrimination with the EEOC on April 9, 2018. *See* Pl.'s Resp.

to Def.'s Statement of Facts, at ¶ 67 (Dckt. No. 68). The EEOC issued her a Dismissal and

Notice of Rights on May 13, 2019. *See* Dismissal and Notice of Rights (Dckt. No. 10-1).

Steele filed a complaint on August 7, 2019, alleging age discrimination under the Age

Discrimination in Employment Act ("ADEA") and the Illinois Human Rights Act ("IHRA").

*See* Cplt. (Dckt. No. 1). In October 2019, the Park District moved to dismiss the IHRA claim

because the Illinois administrative body charged with reviewing the claim had not yet finished its

investigation. *See* Def.'s Mtn. to Dismiss (Dckt. No. 10). In response, Steele filed her operative

amended complaint in December 2019, alleging age discrimination under the ADEA (only). *See*

Am. Cplt. (Dckt. No. 18).

Discovery followed, and when it ended, the Park District moved for summary judgment.

*See* Def.'s Mtn. for Summ. J. (Dckt. No. 64).

**Legal Standard**

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts and reasonable inferences in the light most favorable to the nonmoving party. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

**Analysis**

Steele's amended complaint includes only one claim: age discrimination under the ADEA. *See* Am. Cplt., at ¶¶ 67–77 (Dckt. No. 18).

When considering an ADEA claim at summary judgment, the Court considers "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [age] caused

20

the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "[T]he plaintiff's age must have actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 141 (2000) (quotation marks and citation omitted); *see also Ky. Ret. Sys. v. EEOC*, 554 U.S. 135, 143–48 (2008) (holding that pension calculations that accounted for age did not violate the ADEA because they were not "actually motivated by age") (quotation marks omitted).

An age discrimination claim requires evidence that a plaintiff's age was the but-for cause of her adverse employment action. *See Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 718 (7th Cir. 2021); *Carson v. Lake County*, 865 F.3d 526, 532 (7th Cir. 2017) ("A plaintiff seeking to recover for disparate treatment under the ADEA must 'prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action.'") (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009)); *Igasaki v. Illinois Dep't of Fin. & Prof'l. Regul.*, 988 F.3d 948, 960 (7th Cir. 2021). "In other words, '[t]o recover under a theory of disparate treatment in the ADEA context, it's not enough to show that age was *a* motivating factor. The plaintiff must prove that, but for [her] age, the adverse action would not have occurred.'" *Marnocha*, 986 F.3d at 718 (emphasis and alterations in original) (cleaned up).

A plaintiff can carry that burden through direct or circumstantial evidence. Direct evidence of age discrimination "would be an admission that the defendant fired the plaintiff on the basis of his [age]." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017). Circumstantial evidence may include: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise,

that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Id.* (citation omitted).

Traditionally, an ADEA plaintiff had two avenues for proving age discrimination. The first path was the direct method. A plaintiff could "proceed by introducing direct or circumstantial evidence that her employer took an adverse action against her because of her age." *See Carson*, 865 F.3d at 532–33.

The second route was the indirect method. That is, a plaintiff could "proceed through the burden-shifting framework adapted from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973)." *Id.* at 533. Under this method, "the plaintiff must come forward with evidence showing that '(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably.'" *Id.* (quoting *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016)). If the plaintiff establishes those elements, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* (cleaned up).

But the Seventh Circuit has "tried to move away from the many multifactored tests in employment discrimination cases," and has walked toward a more holistic approach. *See Monroe*, 871 F.3d at 504. "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence." *Ortiz*, 834 F.3d at 765.

"[I]t's best to resist the temptation to rigidly compartmentalize the evidence in discrimination cases into different analytical boxes; rather, 'all evidence belongs in a single pile and must be evaluated as a whole.'" *See Mahran v. Advocate Christ Med. Ctr.*, 12 F.4th 708, 714 (7th Cir. 2021) (quoting *Ortiz*, 834 F.3d at 766). Courts should not be "asking whether any particular piece of evidence proves the case by itself," but rather courts should be "aggregating the evidence 'to find an overall likelihood of discrimination.'" *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 924 (7th Cir. 2020) (quoting *Ortiz*, 834 F.3d at 763, 765).

To that end, the Court must consider "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [age] caused the discharge or other adverse employment action." *See Ortiz*, 834 F.3d at 765. "At summary judgment, '[w]hat matters is whether [a plaintiff] presented enough evidence to allow the jury to find in [his] favor.'" *Igasaki*, 988 F.3d at 957–58 (brackets in original) (quoting *Vega v. Chicago Park Dist.*, 954 F.3d 996, 1004 (7th Cir. 2020)).

The Park District walks through each of the three approaches (direct, indirect, and *Ortiz*) in its motion for summary judgment. It argues that Steele has failed to come forward with sufficient evidence of discrimination, no matter which method the Court uses. *See* Def.'s Mem. in Support of its Mtn. for Summ. J., at 4–10 (Dckt. No. 65).

In response, Steele does not argue that she came forward with sufficient evidence under the direct method, or under the indirect method. Instead, Steele invokes the holistic approach under *Ortiz*. She argues that the record, when viewed as a whole, includes enough circumstantial evidence of age discrimination to support a verdict in her favor. *See* Pl.'s Mem. in Opposition to Def.'s Mtn. for Summ. J., at 4–15 (Dckt. No. 69).

23

So the question before the Court is whether the evidence, viewed as a whole under *Ortiz*, is sufficient to support a claim of age discrimination. Steele builds and frames her case with two central pillars of evidence: (1) the statements and behavior of her supervisors; and (2) evidence of pretext. This Court follows suit.

### A.       Statements and Behavior

Steele begins by pointing to a string of statements and behavior that, in her view, suggest age discrimination. They involve: (1) comments about changing the culture at the Park District; (2) phrases by Mulready (again, the Facility Manager) about the need for something new; (3) a perception that older employees were treated worse than younger employees; and (4) complaints about age discrimination to the EEOC by other older employees. Overall, it's a hefty record, thick with material. But after diving in, and drilling down, there isn't much there.

Even when considered together in "single pile," the evidence is too thin to support a claim of age discrimination. *See Ortiz*, 834 F.3d at 766. Overall, the evidence is too general, the comments were too vague, and the perceptions were too insubstantial. Steele may believe that the Park District favored younger employees over older employees. But there isn't much concrete evidence. What's there isn't strong enough to support a jury verdict.

The evidence is especially sparse when looking for a connection to Steele's termination. Recall, the case is about why Steele was let go. Steele has the obligation to come forward with sufficient evidence to support a jury verdict that her age was not *a* reason, but *the* reason why the Park District terminated her. *See Marnocha*, 986 F.3d at 718. She needed evidence that her age had a "determinative influence on the outcome." *See Reeves*, 530 U.S. at 141. And the evidence simply isn't there.

24

First, Steele argues that a new, young management wanted "to change the culture at [the Park District] and push the older employees out." *See* Pl.'s Mem. in Opposition to Def.'s Mtn. for Summ. J., at 4 (Dckt. No. 69).

As a threshold matter, "[t]he desire to establish a new management philosophy by assembling a new management team that displaces older employees does not *ipso facto* [constitute] ADEA discrimination." *Dale v. Chicago Trib. Co.*, 797 F.2d 458, 465 n.11 (7th Cir. 1986); *see also Korotko-Hatch v. John G. Shedd Aquarium*, 65 F. Supp. 2d 789, 801–02 (N.D. Ill. 1999). Companies, businesses, and government agencies routinely go through culture changes. That's how they survive long term in an ever-changing world. A desire for a new approach might add a little something to the mix when evaluating a discrimination claim, but it doesn't add much.

To support her argument, Steele points to the ages of the new management, all of whom were between 27 and 37 years old. *See* Pl.'s Mem. in Opposition to Def.'s Mtn. for Summ. J., at 4 (Dckt. No. 69). Again, that fact might help set the stage, but it does little else. It's a starting point, at most. *See Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 361 (7th Cir. 2001) ("On reflection, we offer the counterdictum that the relative ages of the terminating and terminated employee are relatively unimportant.").

Steele then points to phrases used by Mulready about the need for a fresh approach. She made statements such as "keep everything fresh," "we need new," and "push for innovation." *See* Pl.'s Statement of Additional Facts, at ¶ 5 (Dckt. No. 68). Steele testified: "On occasion, [Mulready] would use phrases like 'things were stale, things needed to be – they were stagnant, everything needed to be spiced up,' basically things like that." *See* Steele Dep., at 119:8-11 (Dckt. No. 68-2). Again, there's not much there.

A need for a new approach is not particularly noteworthy. New management often brings a new way of doing things. Oftentimes, that's why new leadership is there in the first place. It is a stretch to interpret those phrases as an expression of bias against older employees. And the comments were not directed at Steele's job performance, or otherwise linked to her termination. *See Davis v. Con-Way Transp. Central Express, Inc.*, 368 F.3d 776, 788 (7th Cir. 2004) (placing no value in "stray comments" that lacked a link to the "termination decision"); *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 576 (7th Cir. 2003) (downplaying "'stray' workplace remarks" because of the "lack of any connection to that [termination] decision").

Some statements in question (namely, "keep everything fresh," "we need new," and "push for innovation") are innocuous when viewed in context, too. *See Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 720 (7th Cir. 2018) (underscoring the need to view comments "in context"). Mulready explained that she made her statements in the context of innovating the Park District's programming and improving client experiences. *See* Steele Dec., at ¶ 13 (Dckt. No. 68-24, at 3 of 12). Steele offers no countervailing evidence that Mulready directed those comments at older employees. There is no evidence that comments about the need for a new approach targeted the old and spared the young.

Steele offers declarations from two other employees who heard similar comments. *See* Huber Dec., at ¶ 10 (Dckt. No. 68-24, at 6 of 12) ("I observed Ms. Mulready use words and phrases like 'stale,' 'stagnant,' 'not up to the task,' and 'not able to handle,' when referring to or speaking about older employees. My [sic] contrast, Ms. Mulready referred to younger employees as 'new blood.'"); Daniels Dec., at ¶ 10 (Dckt. No. 68-24, at 11 of 12) (same). Those declarations might add a little something, but not a lot.

26

There is no evidence that Mulready directed those phrases at Steele. They're at a high level of generality, both in terms of their substance and their intended audience. And even if they were directed at Steele, saying that an employee is not up to the task and cannot handle the work does not smack of discrimination. *See Hoffman v. MCA, Inc.*, 144 F.3d 1117, 1122 (7th Cir. 1999) (holding that an employer's call for "fresh legs" in the office "could have been talking about hiring additional personnel, not replacing" the plaintiff and "is too vague for [the court] to read it as inculpating" the defendant). Saying that an organization needs a new approach is not particularly noteworthy, either.

The timing of the comments is up in the air, too. Proof of "age-based derogatory remarks made *around the time of and in reference to* an employment action are relevant to a finding of discrimination." *See Schuster*, 327 F.3d at 575 (emphasis added). It is true that "less directly related comments, in combination with other evidence, might support an indirect case under the *McDonnell Douglas* approach." *Id.* But "[t]he less direct the connection between the comment and the employment action – that is, if the comment was not made in temporal proximity to the employment action, or if the comment was not made in reference to that action – the less evidentiary value the comment will have." *Id.* at 576.

But there's nothing in the statements of fact about when, exactly, Mulready made the comments in question. Maybe they took place around the time of the termination. Or maybe not. Without a temporal link, the comments don't lend much support to the notion that Steele's age was the reason for her termination.

Second, Steele argues that Mulready showed "a preference for young employees and a bias against older employees." *See* Pl.'s Mem. in Opposition to Def.'s Mtn. for Summ. J., at 4 (Dckt. No. 69). Once again, the evidence is thick in volume, but thin in substance.

According to Steele, Mulready was "friendly kind [sic] with younger employees and harsh and rude to older employees." *See* Pl.'s Statement of Additional Facts, at ¶ 31 (Dckt. No. 68). She relies on a declaration from a witness, who stated that Mulready "would speak to [her] rudely and accuse [her] of wrongdoing and she would micromanage [her]." *See* Daniels Dec., at ¶ 10 (Dckt. No. 68-48). But having a rude, micromanaging boss doesn't say much about whether the boss terminated someone because of her age. *See Ford v. Minteq Shapes & Servs., Inc.*, 587 F.3d 845, 848 (7th Cir. 2009) ("Although we find these comments rude and offensive, Title VII is 'not . . . a general civility code' and will not find liability based on the 'sporadic use of abusive language.'") (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)); *see also Hoosier v. Greenwood Hosp. Mgmt. LLC*, 32 F. Supp. 3d 966, 978 (N.D. Ill. 2014) ("[A]nti-discrimination laws are not triggered by rude behavior.").

Steele gave a few other examples of when, in her view, Mulready treated younger employees better. She argues that Mulready gave her replacement, Erin O'Brien, second chances after her performance dropped off and "repeatedly" referenced her young age in doing so. *See* Pl.'s Statement of Additional Facts, at ¶ 34 (Dckt. No. 68).

But the evidence tells a different story. Mulready put O'Brien on a Performance Improvement Plan after her performance dropped over six months – just like Ijams had done with Steele years ago. *Id.*; *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 34 (Dckt. No. 68); Performance Improvement Plan (Dckt. No. 66-12, at 34 of 116). And Steele was let go after years of alleged performance problems. There's nothing in the record about a similar track record for O'Brien. *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006) ("Employees are similarly situated if they are directly comparable in all material respects. The inquiry is fact intensive, requiring consideration of the circumstances as a whole.").

Steele contends that the Park District extended deadlines for younger employees, and cut them some slack when they had performance problems. *See* Pl.'s Mem. in Opposition to Def.'s Mtn. for Summ. J., at 5 (Dckt. No. 69); *see also* Pl.'s Statement of Additional Facts, at ¶ 30 (Dckt. No. 68) ("Ms. Mulready extended deadlines and did not always discipline younger employees like Ms. Jansen, Ms. Aviles, and Mr. Martinez when they exhibited performance issues."). But once again, the evidence simply isn't there.

As support, Steele offers a story she heard about Mulready telling Jansen not to worry about missing a deadline. *See* Pl.'s Statement of Additional Facts, at ¶ 30 (Dckt. No. 68); Steele Dep., at 114:5-17 (Dckt. No. 66-8). When pressed for specifics – such as the date, timeline of the project, length of the extension, or subject of the project – Steele provided nothing. *See* Steele Dep., at 114:18 – 116:25. And when asked if she had "any other information about . . . how younger and older employees were held to different performance standards," Steele responded, "Not that I remember at this time." *Id.* at 117:5-8.

Steele does offer a declaration from Barbara Daniels, who gave examples of times when younger employees made mistakes but did not receive discipline from Mulready. *See* Daniels Dec., at ¶¶ 4–6 (Dckt. No. 68-48). For instance: "Ms. Mulready let other younger employees like Lauren Jensen (age 25), a full-time supervisory employee, or Erin O'Brien (age 22), also a full-time supervisory employee, get away with many mistakes without discipline. For example, Ms. O'Brien and Ms. Jensen often neglected to set up day-of performance ticket sales for dance and drama performances." *Id.* at ¶ 5.

But there are a few problems. For starters, there is no evidence that those employees were similarly situated. *See Orton-Bell v. Indiana*, 759 F.3d 768, 777 (7th Cir. 2014) ("In general, a plaintiff who believes another individual is similarly situated must at least show that

29

this comparator (1) dealt with the same supervisor, (2) was subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish his conduct or the employer's treatment of him.") (cleaned up); *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014) ("Although precise equivalence is not required in a comparator, a similarly situated employee must be directly comparable to plaintiffs in all material respects.") (cleaned up). There is no evidence about whether any of those employees had comparable jobs, or whether they had a long disciplinary history (like Steele).

Even if those employees were similarly situated, those examples cannot support an inference that Mulready terminated Steele because of her age. There's nothing in the record about how serious the mistakes were by the other employees. And there's nothing in the record about whether those tasks were as important as Steele's tasks. It's something, but it's not much.

Third, Steele claims that "older employees were undervalued, treated poorly and pushed out, fired, or forced to take early retirement." *See* Pl.'s Mem. in Opposition to Def.'s Mtn. for Summ. J., at 6 (Dckt. No. 69). That allegation might help Steele get to trial, if there was evidence to support it. Evidence that the Park District forced older employees to hit the exits – while allowing younger employee to stay – could help Steele's case. But once again, the evidence isn't there.

Steele points to her deposition testimony, but it's too slender of a reed to support anything. When asked what information she had "to support this allegation" that other employees were forced out, Steele responded: "The information that I have is from talking to those employees, and they would tell me their feelings about different – the way they were treated. They felt it was not a healthy environment, that they didn't feel they were valued." *See* Steele Dep., at 134:9-18 (Dckt. No. 66-8).

30

That's an expression of "feelings" about an "[un]healthy environment," but it's not much else. There's a world of difference between former employees feeling undervalued, and an entity forcing out old employees because of their age. The evidence is simply too amorphous and insubstantial to get to trial. *See Sinha v. Bradley Univ.*, 995 F.3d 568, 573 (7th Cir. 2021) ("Conclusions must be supported by specific facts, otherwise they 'are not sufficient to avoid summary judgment.'") (citation omitted).

Steele tendered the declaration of an employee who gave examples of older employees leaving the Park District. But the declarant admits a lack of knowledge on a key point. She does "not know if these older and more long-term employees were being fired or if they quit, but [she] certainly had the impression that they were being forced out." *See* Real Dec., at ¶ 8 (Dckt. No. 68-25).

Fourth, Steele points to the fact that other employees have filed charges of age discrimination against the Park District. *See* Pl.'s Mem. in Opposition to Def.'s Mtn. for Summ. J., at 7 (Dckt. No. 69). For example, Barbara Daniels and Jennifer Huber both filed age discrimination claims with the EEOC. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 9 (Dckt. No. 73); Huber Charge of Discrimination (Dckt. No. 68-24, at 5 of 12); Daniels Charge of Discrimination (Dckt. No. 68-24, at 10 of 12). And Steele correctly observes that "'behavior toward or comments directed at other employees in the protected group' is one type of circumstantial evidence that can support an inference of discrimination." *See Vega*, 954 F.3d at 1005 (quoting *Hansen v. Foley & Lardner LLP*, 552 F.3d 520, 529 (7th Cir. 2008)).

Steele cites their complaints, but the complaints aren't evidence (except to show the existence of the complaints themselves). *See Fiona Chen v. Yellen*, 2021 WL 4192078, at *3 (N.D. Ill. 2021). Steele offered evidence that the employees complained about age

31

discrimination.  But Steele has not offered evidence that the Park District discriminated against those two employees based on their age.

And again, the record does include declarations from Daniels and Huber, but they don't shed much light on whether the Park District fired Steele because of her age.  Daniels stated that Mulready gave extra chances to younger employees, and was rude to older employees.  *See* Daniels Dec. (Dckt. No. 68-48).  Huber recounted how Mulready would not accommodate older workers who had physical limitations with carrying supplies up and down stairs.  *See* Huber Dec. (Dckt. No. 68-49).  That's about it.

Taking a step back, and surveying the evidence as a whole, there simply isn't enough in the record to support a claim of age discrimination.  Steele must show that age was the *but-for cause* of her termination.  She doesn't offer any direct evidence.  And her circumstantial evidence is about the culture at the Park District as a whole, without much of a connection to the situation with Steele.  The evidence is at a high level of generality, and it is too vague and amorphous to support a viable claim.

### B.    Evidence of Pretext

When surveying the evidence writ large, it is important to consider the other side of the story.  The Park District gives a legitimate, nondiscriminatory reason for her termination.  And in response, Steele doesn't offer much reason to doubt it.

The explanation from the Park District is straightforward.  The Park District let her go because she had a disciplinary history, and it caught up with her when the mistakes piled up. The Park District points to Steele's "missing deadlines, lacking follow through on assignments, and exhibiting a lack of attention to detail when performance issues were brought to her

attention." *See* Def.'s Mem. in Support of its Mtn. for Summ. J., at 10 (Dckt. No. 65); Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 32–36, 41–49 (Dckt. No. 68).

The question is whether the Park District's explanation was pretextual. Pretext "is not 'just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action.'" *Barnes v. Bd. of Trs. of Univ. of Illinois*, 946 F.3d 384, 389–90 (7th Cir. 2020) (cleaned up) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008)). To show pretext, a plaintiff must come forward with evidence that "(a) the employer's nondiscriminatory reason was dishonest; and (b) the employer's true reason was based on a discriminatory intent." *Perez v. Illinois*, 488 F.3d 773, 777 (7th Cir. 2007) (quotation marks and citation omitted). "[A] plaintiff would not succeed on her discrimination claim if the employer honestly believed its stated rationale for its adverse employment action, even if this honest belief was foolish, trivial, or baseless. But, a plaintiff would win her case if she showed that the stated reason, even if actually present to the mind of the employer, wasn't what induced the employer to take the challenged employment action, because that would constitute pretext." *de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 561 (7th Cir. 2019) (cleaned up).

Steele gives a few reasons why, in her view, the proffered reason wasn't the real reason. She points to her favorable work history. She thinks that the Park District jumped the gun and proceeded to termination too quickly. She believes that the Park District exaggerated her mistakes. And she contends that the Park District offered differing explanations for her termination.

First, Steele points to her "long, favorable and effective employment history and [the Park District's] quick jump to termination – instead of engaging its established discipline practices." *See* Pl.'s Mem. in Opposition to Def.'s Mtn. for Summ. J., at 8 (Dckt. No. 69).

But there are a few problems. A positive work history does not demonstrate pretext by itself. "Put differently, past positive evaluations do not guarantee future employment." *See Igasaki*, 988 F.3d at 959. Steele's performance at the time of her termination is the focal point. *See Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir. 2009). And here, there is evidence in the record that Steele wasn't performing. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 54–60 (Dckt. No. 68).

Steele also overlooks and downplays her work history, which was decidedly choppy. She was disciplined in 2012. *Id.* at ¶ 32; Corrective Interview Form (Dckt. No. 66-12, at 32–33 of 116). She was placed on Performance Improvement Plan in 2012. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 34 (Dckt. No. 68); Performance Improvement Plan (Dckt. No. 66-12, at 34 of 116). She was disciplined again in 2015. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 36; Corrective Discipline Form (Dckt. No. 66-12, at 52 of 116). And she was disciplined again in 2017. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 46; Corrective Discipline Form (Dckt. No. 66-12, at 53–54 of 116). All of that took place before the deadline problems in 2017, which immediately preceded her termination. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 57–61. That's a steady current of evidence, flowing against her.

Steele faults the Park District for terminating her, instead of putting her on a Performance Improvement Plan. *See* Pl.'s Mem. in Opposition to Def.'s Mtn. for Summ. J., at 8 (Dckt. No. 69). She points out that the Park District has a policy "whenever possible, to resolve disciplinary and/or performance issues by use of verbal, written or other forms of coaching and/or counseling." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 6 (Dckt. No. 68) (quoting Fox Valley Park District Personnel Policy Manual § 8.31, at 118 (Dckt. No. 66-4, at 36 of 60)).

That argument overlooks the elephant in the room. The Park District did, in fact, use progressive discipline with Steele. Steele wanted a Performance Improvement Plan, but what she really means is that she wanted a *second* Performance Improvement Plan. The Park District already put her on such a plan. And it did not solve the problems, because after that plan went into effect (in 2012), the District disciplined her twice (in 2015, and in 2017).

The argument about progressive discipline is a poor fit for this case for other reasons, too. The absence of progressive discipline – such as warnings to the employee about poor performance – can support a finding of pretext. But the employer must fail to follow its own internal procedures. *See Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 727 (7th Cir. 2005) ("[A]n employer's failure to follow its own internal employment procedures can constitute evidence of pretext."); *Giancoletto v. Amaz Zinc Co., Inc.*, 954 F.2d 424, 427 (7th Cir. 1992). Here, the Park District followed its own procedures.

The Park District's personnel policy states that its "list of . . . possible disciplinary measures in no way guarantees that an employee will receive all of these measures prior to dismissal; an employee can be dismissed without prior disciplinary action." *See* Fox Valley Park District Personnel Policy Manual § 8.31, at 118 (Dckt. No. 66-4, 36 of 60). Then, in "a non-exhaustive list of conduct and/or performance issues that may result in disciplinary action by the District, *up to and including dismissal*," the policy manual lists "[i]ncompetence, ineffectiveness, inefficiency or wastefulness in the performance of assigned duties and responsibilities" and "[f]ailure or refusal to carry out instructions, acts of insubordination, willful disregard of orders." *Id.* at 120 (emphasis added).

35

The Park District used "verbal, written or other forms of coaching and/or counseling" at least four times with Steele. And under the policy, terminating Steele for continuing poor performance was within the field of play.

Second, Steele accuses the Park District of making "inaccurate exaggerations" when it contends that Steele made the "'same mistakes' over multiple programming sessions." *See* Pl.'s Mem. in Opposition to Def.'s Mtn. for Summ. J., at 9 (Dckt. No. 69). "'[F]lagrant inaccuracies and inconsistencies in the employer's supposed reason' for firing the plaintiff can be evidence of pretext." *Vega*, 954 F.3d at 1005 (citation omitted).

Steele walks through a few examples. She starts with the Park District's claim that Steele missed a February 2017 deadline to reserve dance rooms. *See* Pl.'s Mem. in Opposition to Def.'s Mtn. for Summ. J., at 10 (Dckt. No. 69). Steele argues that she had reserved rooms her own way for years, and her responsibilities did not change when the Park District switched from CLASS to RecTrac. *Id.* As a result, by not scheduling the classes by the February 9 date, Steele did not miss a deadline – she "was following established procedure." *Id.*

But in her filings, Steele admitted that she couldn't play by her own set of rules. Steele admitted that "[t]he Marketing Department 2017 Activity Guide timelines specify that by February 9, 2017, Recreation Supervisors were required to enter all programs into RecTrac, among other deadlines." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 37 (Dckt. No. 68). She also admitted that "[t]his deadline applied to all Recreation Supervisors with programming responsibility, including Steele." *Id.* There is ample evidence that she failed to meet that deadline.

Next, Steele argues that the Park District acted unreasonably by not fully training Steele on RecTrac and by exaggerating the disruption on Summer Registration Day. *See* Pl.'s Mem. in

Opposition to Def.'s Mtn. for Summ. J., at 10–11 (Dckt. No. 69).  On the training point, Steele received 12 hours of training over 3 separate training sessions.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 19 (Dckt. No. 68).  She testified that she wanted *more* training but never received any.  *See* Steele Dep., at 86:3 – 91:6 (Dckt. No. 66-8).  But without evidence that the Park District trained younger employees, but failed to train older employees, Steele's desire for more training doesn't show pretext.

And regardless, her lack of training is not a "flagrant inaccurac[y] or inconsistenc[y]," because the Park District has never denied that she did not receive additional training.  *See Vega*, 954 F.3d at 1005.

Then, Steele claims that the Park District exaggerated when it said that she "missed a deadline" for the June 2017 Word proof, because she did not believe that the deadline existed. *See* Pl.'s Mem. in Opposition to Def.'s Mtn. for Summ. J., at 11–12 (Dckt. No. 69).  Also, Steele testified that Jansen "told [her] fine, don't worry about it" when she said she would be late.  *See* Steele Dep., at 188:20-21 (Dckt. No. 66-3).

But Steele *agreed* that she "did not meet the 5:00 p.m. deadline set by Mulready" in her response to the Defendant's statement of facts.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 56 (Dckt. No. 68).  So, even if Steele is correct that Jansen okayed her extension, she cannot now argue that the Park District is exaggerating by calling it a missed deadline.  And she certainly cannot say that the Park District's characterization is a "flagrant inaccuracy" if she agreed to it.

Last, she argues that the Park District cannot say that she missed a deadline by not responding to the email regarding changes to her Word proof.  *See* Pl.'s Mem. in Opposition to Def.'s Mtn. for Summ. J., at 12 (Dckt. No. 69).  She argues that her next deadline was June 26,

and "it was unclear to her that there was an assignment to complete because Ms. Jansen advised her that the work was done." *Id.* Even if *Jansen* told Steele that she was done, *Mulready's* email is clear as day. She asks all Recreation Supervisors to "make appropriate changes in RecTrac." *See* 6/9/2017 Email (Dckt. No. 66-24, at 17 of 21). So this is not an exaggeration, either.

Third, Steele claims that "[e]xplanations about how [her] termination came to pass change, depending on who and when the question is asked." *Id.* at 13. The Court could interpret this sentence to contain two concerns. That is, Steele could be upset with changing explanations about *why* she was terminated, or she could be upset with changing explanations about *who* terminated her.

"Shifting and inconsistent explanations can provide a basis for a finding of pretext." *Schuster*, 327 F.3d at 577. Other courts in this district have held that "inconsistent statements about who made the decision to terminate [the plaintiff] may appropriately be considered circumstantial evidence of a discriminatory motive for [the plaintiff's] termination." *EEOC v. RJB Props., Inc.*, 857 F. Supp. 2d 727, 774 (N.D. Ill. 2012). But there are simply no shifting statements here.

To start, none of the individuals named – Jansen, Mulready, Fenton, Hayes, or Ijams – ever provided reasons other than the legitimate, nondiscriminatory reasons given by the Park District in its briefing. So Steele's "argument about 'shifting explanations' . . . is somewhat less persuasive," since her conduct "has always been at the heart of [the Park District's] stated basis for termination." *Id.* at 774.

And the role played by each of the participants isn't up in the air, either, in any meaningful way. As explained above, the record reveals who played a role in the decision. At best, Steele points to some wiggle room about the exact role played by Mulready. Steele

correctly notes that Mulready "refused to answer questions about her role," but after a break to confer with counsel, Mulready stated that she "did not drive the decision." *See* Pl.'s Mem. in Opposition to Def.'s Mtn. for Summ. J., at 13 (Dckt. No. 69) (quoting Mulready Dep., at 168:24 (Dckt. 66-14)). That's not much room to wiggle. And it's not much of a reason to think that the true reason was Steele's age.

Steele's last complaint is that the administrators (Erickson and Pilsen) did not conduct an independent investigation. Instead, they trusted their officers' decision. But this is not a contradiction – it's an admitted fact. *See* Pl.'s Mem. in Opposition to Def.'s Mtn. for Summ. J., at 13 (Dckt. No. 69); Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 64 (Dckt. No. 68). The Park District has consistently stated that Erickson and Pilsen "reviewed and approved the decision to terminate." *See* Def.'s Statement of Facts, at ¶ 64 (Dckt. No. 66). It never argued that they conducted their own investigation. The language "reviewed and approved the decision" necessarily implies other people made a decision, and then they checked it over.

So, once again, Steele points to no evidence of suspicious or shifting stories. Any questions about identities and roles of decisionmakers are easily answered, and those answers do not serve as evidence of pretext.

None of Steele's theories about pretext hold water. As a result, Steele fails to show the Park District's reasons for her termination were pretextual. And without proof of pretext, Steele does not have evidence of age discrimination.

## Conclusion

For the foregoing reasons, the Court grants Defendant's motion for summary judgment.

Date:    February 25, 2022

Steven C. Seeger
United States District Judge